**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| **NATIONAL FOOTBALL LEAGUE** | ) | |
| **PLAYERS ASSOCIATION AND** | ) | |
| **NATIONAL FOOTBALL LEAGUE** | ) | |
| **PLAYERS INCORPORATED**, | ) | |
| | ) | Civil Action No.   3:26CV374 |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LEAF TRADING CARDS, LLC**, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## COMPLAINT

Plaintiffs National Football League Players Association (the "NFLPA") and National Football League Players Incorporated ("NFLPI," and collectively with the NFLPA, "Plaintiffs"), by and through counsel, in support of their Complaint against Leaf Trading Cards, LLC ("Leaf"), state as follows:

## INTRODUCTION

1.      This action is brought by Plaintiffs against Leaf, a manufacturer and seller of sports and entertainment products, including trading cards, based on its knowing and deliberate misappropriation of National Football League ("NFL") players' rights of publicity for Leaf's own commercial purposes and without Plaintiffs' consent.

2.      Plaintiffs are the assignees of and act as the exclusive licensing agents for NFL players' ("Players") names, images, likenesses, nicknames, initials, personas, personal indicia, jersey numbers, autographs/signatures (including facsimiles), voices, pictures, photographs,

animation, identities, statistics, biographical information and/or other identifying characteristics of the Players (collectively, the "Attributes") when used in a group of six (6) or more Players within a consecutive twelve-month period (the "Group Player Rights"). The Group Player Rights correspondingly cover any product, service, sponsorship, endorsement, promotion or any commercial use whatsoever, regardless of Players' team affiliations and regardless of whether the six-Player threshold is reached using Players' Attributes simultaneously (*e.g.*, in a single item, such as a trading card), individually (*e.g.*, in interrelated or a series of items within a single product category, such as trading cards) or concurrently (*e.g.*, in a product line, such as a set of trading cards).

3.      Group licensing is a common practice in professional team sports. Group licensing allows licensees one-stop shopping to secure the right to include large groups of Player names, images, likenesses, and other attributes in their products. Without group licensing, licensees would have to acquire hundreds or thousands of Player rights one by one. Thus, licensees benefit from the efficiency of securing the intellectual property rights of Players from a single source: here, Plaintiffs. Without group licensing, consumer products utilizing the Group Player Rights of groups of NFL Players—like a complete set of trading cards or simulated video games—would not be available.

4.      As Leaf surely knows, or should have known, virtually every single Player has participated in the NFLPA exclusive group licensing program since its inception more than 30 years ago—many tens of thousands of Players in total. Presently, 100% of Players are participating and thus have assigned their Group Player Rights to Plaintiffs on an exclusive basis. The Attributes and Group Player Rights have substantial value, and the ability to control how Players' Attributes are used is of great significance to Plaintiffs and to Players. Indeed, a court recently acknowledged

that MLB Players Inc., the corporate subsidiary of the Major League Baseball Players Association that similarly acts as the exclusive group licensing agent for Major League Baseball players' names, images, and likenesses ("NIL"), has a "valuable interest" in Major League Baseball players' "NILs when used as a group." *MLB Players Inc. v. DraftKings, Inc.*, 771 F. Supp. 3d 513, 534–35 (E.D. Pa. 2025), *motion to certify appeal denied*, No. cv-24-4884-KSM, 2025 WL 1462547 (E.D. Pa. May 21, 2025).

5.      Leaf, founded in 2010, is a private company that, among other products, produces trading cards and sports collectibles. At present, Leaf is using the Attributes of (far) more than six Players in its trading card products ("Trading Cards") without any license from Plaintiffs as is required to use Group Player Rights. Upon information and belief, Leaf did not even secure rights from many of the individual Players to use their Attributes on a *non*-group basis (*i.e.*, Trading Cards collectively featuring five or fewer Players). Nonetheless, Leaf's website and marketing materials prominently feature Players' images and personas. Leaf's misappropriation is a brazen violation of Plaintiffs' Group Player Rights.

6.      Players retain the right to license their NIL on an individual or non-group basis, *e.g.*, to engage in deals that allow a brand to use a Player's individual NIL to promote that brand. A Player may, for instance, sign a licensing or services agreement with a company to license or autograph trading cards. Regardless, however, if a company like Leaf wishes to use six or more Players in its products, then it must obtain the right to use Group Player Rights from Plaintiffs. Not only has Leaf failed to do that, but Leaf is also, upon information and belief, using multiple Players' images and personas on Trading Cards without entering into a valid contract with the individual Players.

7.      Leaf's commercial use of Players' images and personas in its Trading Cards and in associated advertising, without a license for such use, is a clear violation of Virginia's right of publicity statute, Va. St. § 8.01-40 *et seq*.

8.      Additionally, Leaf's actions are intentional, material, and made for the purpose of influencing customers to purchase Leaf's Trading Cards in violation of the Lanham Act. Leaf's actions are likely to deceive customers into believing that Leaf holds a license to use Group Player Rights in its Trading Cards. Further, Leaf's actions and statements are likely to deceive the public into believing that Leaf's Trading Cards are associated with, sponsored by, or approved by Plaintiffs and/or Players featured on the products, when they are not.

## PARTIES

9.      The NFLPA is a non-profit corporation organized under the laws of the State of Virginia with its principal place of business located in Washington, D.C., making it a citizen of both Virginia and Washington, D.C. The NFLPA is the labor union representing professional football Players in the NFL. The NFLPA acts as the exclusive bargaining agent for all Players in matters concerning wages, hours and working conditions, and protects their rights as professional football Players. In this role, the NFLPA ensures that the terms of the Collective Bargaining Agreement are met, enhances and defends the image of Players and their profession on and off the field, negotiates and monitors retirement and insurance benefits, provides assistance to charitable and community organizations, and provides many other member services and activities to its Player-members.

10.     NFLPI is a Virginia corporation with its principal place of business located in Washington, D.C., making it a citizen of both Virginia and Washington, D.C. NFLPI was established in 1994 as the for-profit licensing and marketing arm of the NFLPA. NFLPI, among

4

other things, facilitates the marketing and sale of licenses to consumer product manufacturers to use the Group Player Rights. Today, the NFLPA and NFLPI are parties to dozens of such license agreements for a variety of consumer products, including trading cards, collectibles, video games, and other retail products and services. Royalty revenues from these agreements are distributed to the Players, as well as shared with the NFLPA to help fund union operations.

11.    Players sign group licensing assignments ("GLAs"), to "assign[] [Plaintiffs] the exclusive right to use and/or grant to persons, firms, entities, or corporations (collectively 'licensees') the right to use [Player's] name, nickname, initials, autograph/signature (including facsimiles), voice, picture, photograph, animation, image, likeness, persona, jersey number, statistics, data, copyrights, and/or biographical information . . . in group licensing programs." Thus, the GLA is the mechanism by which Players assign to Plaintiffs the Group Player Rights at issue in this lawsuit.[1] Moreover, every time a Player signs the collectively-bargained NFL Player Contract template, the Player agrees to Paragraph 4(b), which similarly exclusively assigns the Player's NIL rights to the NFLPA "for use in connection with any product, brand, service, appearance, product line or other commercial use and any sponsorship, endorsement or promotion thereof, when more than five (5) NFL player Rights are involved, regardless of team affiliation and whether that number is reached using player Rights simultaneously or individually, in any form, media, or medium (now known or hereafter developed) during a consecutive 12-month period . . . ."[2]

---

[1] Information concerning the NFLPA's Group Player Rights program is publicly available on the NFLPA and NFLPI's website. *See* https://nflpa.com/partners/licensing.

[2] NFL-NFLPA Collective Bargaining Agreement, App'x A, § 4(b) (Mar. 15, 2020), available at https://nflpaweb.blob.core.windows.net/website/PDFs/CBA/March-15-2020-NFL-NFLPA-Collective-Bargaining-Agreement-Final-Executed-Copy.pdf.

12.     Plaintiffs not only license the Group Player Rights, but also protect and enforce these rights. Pursuant to the GLA, Plaintiffs monitor and police third parties who use Group Player Rights assigned to Plaintiffs without first obtaining a license from Plaintiffs and/or those who infringe on Group Player Rights with counterfeit products.

13.     Leaf is a Texas limited liability company with its principal place of business located in Carrollton, Texas. As of the time of filing this action, the individual members of Leaf are Gray Family Enterprises, LLC and Brian Gray Enterprises, LLC, both of which are Texas limited liability companies and are both incorporated in Delaware. Brian Gray is the sole member of both Gray Family Enterprises, LLC and Brian Gray Enterprises, LLC, and Mr. Gray is a citizen of Texas.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action asserts a claim under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, against Leaf.

15.     This Court has supplemental jurisdiction over Plaintiffs' state law claim for the misappropriation of rights of publicity brought in violation of Va. St. § 8.01-40 *et seq.*, pursuant to 28 U.S.C. § 1367 because it arises from the same nucleus of operative fact as the federal Lanham Act claim.

16.     This Court also has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as Plaintiffs and Leaf (including its members) are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs. Plaintiffs are both entities organized under the laws of the State of Virginia with principal places of business in Washington, D.C. Leaf is a limited liability company organized

under the laws of the State of Texas, with its principal place of business in Carrollton, Texas, and whose members are citizens of Delaware and Texas.

17.    This Court has personal jurisdiction over Leaf because it regularly, continuously, and systematically transacts, conducts, and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from its products provided to persons in this District, including through the infringing activities challenged in this action. Leaf has engaged in substantial activities purposefully directed at Virginia from which Plaintiffs' claims arise, including, for instance, operating a website[3] accessible in Virginia through which customers in Virginia can order infringing products, and selling infringing products through at least one local retailer/distributor with a location in this District (pictured below).[4] Much of the conduct alleged in this Complaint arises directly from Leaf's forum-directed activities—specifically, repeated acts of infringement challenged in this action. Moreover, it is common knowledge in the sports licensing business that Plaintiffs exclusively control the Group Player Rights and that they are both incorporated in Virginia.

---

[3] Available at https://www.leaftradingcards.com/.

[4] Available at https://www.leaftradingcards.com/find-stores (listing Graybo's Sports Cards as a retailer with a location in Richmond, VA).



18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this Complaint occurred in this District. Venue is proper in the Richmond Division because a substantial part of the events or omissions giving rise to the claims occurred in that Division, including sales of the infringing products in a retailer located in the city of Richmond, and online sales directed into this Division.

## FACTUAL ALLEGATIONS

### A. Plaintiffs' GLAs

19.     Players spend their lives and careers developing the specialized skills necessary to succeed at the professional level. One of the most important rewards for the small number of athletes who play professional football in the NFL is the establishment of a personal and professional identity. There is inherent commercial value in the identity of Players who are part of the NFL and members of NFL teams. Players benefit from approved uses of their public personas

8

by sponsoring and supporting causes and institutions that are meaningful to them. They also use their public personas and identities for commercial benefit and for the benefit of their union (*i.e.*, the NFLPA) and fellow union members through means such as licensing and promotional agreements negotiated by Plaintiffs on their behalf.

20.    For Players, the ability to control the commercial use of their names, images, likenesses, and personas (commonly referred to as the "right of publicity") is a crucial return on their substantial career investment. It also enables athletes to avoid being associated with companies, commercial products, and industries that they do not wish to be perceived as supporting and endorsing.

21.    While Players retain the authority to commercially exploit their identities on a non-Group Player Rights basis (*i.e.*, individually and among groups of five or fewer Players), Plaintiffs are the assignees of and the exclusive licensing agents for Players' Group Player Rights—including with respect to Trading Cards. Thus, a company like Leaf may not feature six or more Players in Trading Cards without a license from Plaintiffs. The Attributes and Group Player Rights have substantial value, and the ability to control how Players' Attributes are used is of great significance to Plaintiffs and Players.

22.    In their role as licensing agents, Plaintiffs regularly negotiate group licensing agreements authorizing the use of six or more Players' Attributes in a range of commercial products and services. These agreements ensure that Players are associated only with brands, products, and services that they choose to support; that the commercial value of their rights is neither tarnished nor diluted through misuse or overuse; and that Players receive fair compensation when their Attributes are used to increase the consumer appeal of a brand, product, or service.

9

23.    Given the popularity of the NFL and the Players who drive that popularity, unscrupulous actors sometimes create unlicensed—and often low quality—products bearing Player names, images, likenesses, and personas. The expansion of online shopping has made it easier for these actors to fool consumers into believing that their products are officially licensed by Plaintiffs or endorsed or approved of by the Players featured therein, and ultimately deprive Players of the fruits of their labor.

24.    Group Player Rights are commercially valuable, and Plaintiffs have the right to use and license these Group Player Rights and expend significant efforts and resources protecting these rights.

**B.  Leaf's Unauthorized Uses of Players' Images and Personas in its Trading Cards**

25.    Leaf is using the Attributes of (far) more than six Players in its Trading Cards and advertising on its website. But Leaf has no license or authorization from Plaintiffs—the *exclusive* licensors of Group Player Rights—as is required. Although individual authorizations from individual Players are insufficient for any company to use Group Player Rights, upon information and belief, Leaf does not even possess individual authorizations from certain Players whose Attributes it is using in Trading Cards.

26.    For example, in December 2025, Leaf released its "2025 Leaf Trinity Football"[5] and "2025 Leaf Eclectic Signature Series Football"[6] Trading Card sets (both pictured below), both of which misappropriate Group Player Rights—*i.e.*, use more than five Players—without any license from Plaintiffs.

---

[5] Available at https://www.leaftradingcards.com/products/2025-leaf-trinity-football.

[6] Available at https://www.leaftradingcards.com/products/2025-leaf-eclectic-signature-series-football.

10

 

27.     Leaf's "2026 Leaf PayDirt Football"[7] Trading Card set (pictured below), released in February 2026, again infringes on Group Player Rights.



28.     Leaf's "2026 Leaf Metal Football"[8] Trading Card set (pictured below), released in March 2026, also misappropriates Group Player Rights without a license.

---

[7] Available at https://www.leaftradingcards.com/products/2026-leaf-paydirt-football.

[8] Available at https://www.leaftradingcards.com/products/2026-leaf-metal-football.



29.    Leaf's website states that two additional releases are scheduled for May 2026: the "2026 Leaf Spectacular Football" and "2026 Leaf Optichrome Football" Trading Card sets, both of which, upon information and belief, will infringe on Plaintiffs' Group Player Rights.[9]

30.    The foregoing allegations are merely illustrative of Leaf's infringement and its plans to continue infringing upon Plaintiffs' rights.

**C.  Leaf Disregarded Plaintiffs' Cease and Desist and Continues to Use Group Player Rights**

31.    Promptly after discovering Leaf's unauthorized use of Player Attributes, on July 21, 2025, NFLPI and the NFLPA's exclusive licensing agent for Trading Cards, OneTeam Partners, LLC ("OneTeam"), sent a letter to Leaf asking it to identify whatever putative authority Leaf possessed to use Players' Attributes in Trading Cards. *See* S. Gage and T. Slavin July 21, 2025 Letter to J. Pankow (attached hereto as Ex. 1). In response, Leaf refused to provide any information and instead took the incorrect position that six or more Players needed to be included on a single and "specific Leaf Trading Card" in order to implicate the Group Player Rights. *See* J. Kravitz July 23, 2025 Letter to T. Slavin and S. Gage (attached hereto as Ex. 2). Leaf's position is nonsensical and counterfactual given that Leaf currently has licensing partnerships with other

_____

[9] Available at https://www.leaftradingcards.com/releases.

sports league player associations[10] and surely understands the mechanics of a group licensing program, let alone the NFLPA's exclusive group licensing program.

32.     Further, as Leaf knew or should have known, information concerning the NFLPA's exclusive group licensing program and Group Player Rights is made publicly available on its website. Such information is also widely understood by trading card companies and other businesses that license rights from Players Associations. Accordingly, Leaf, through minimal due diligence, could and should have confirmed the process of securing Group Player Rights.

33.     After Leaf refused to cooperate, Plaintiffs conducted additional diligence to learn what they could. Plaintiffs eventually determined that Leaf was using the Attributes of dozens of Players in its Trading Cards without any license from Plaintiffs to do so. Leaf may be using or planning to use additional Players—but Plaintiffs do not know for certain, and Leaf refused to provide this information.

34.     Although only Plaintiffs (and not individual Players) can authorize the use of Group Player Rights, Plaintiffs also determined that Leaf possesses *no* current authorization from multiple Players in the group that it is using. Leaf may be using or planning to use additional Players without so much as their *individual* authorizations—but Plaintiffs do not know and Leaf refused to provide this information.

35.     On October 10, 2025, Plaintiffs demanded that Leaf immediately cease and desist all uses of the Group Player Rights. *See* D. Greenspan Oct. 10, 2025 Letter to J. Kravitz (attached hereto as Ex. 3).

---

[10] *See* Baseball America, "Leaf to Produce Minor League Baseball Trading Cards" (July 3, 2025), https://www.baseballamerica.com/stories/leaf-to-produce-minor-league-baseball-trading-cards-see-exclusive-images-from-the-first-release/; *see also* PR Newswire, "Leaf Trading Cards Announces an Exciting Partnership with PBA" (June 20, 2023), https://www.prnewswire.com/news-releases/leaf-trading-cards-announces-an-exciting-partnership-with-pba-301855351.html.

36.     Weeks later, on October 28, 2025, Leaf's counsel notified Plaintiffs that Leaf would not stop misappropriating the Group Player Rights. *See* J. Kravitz Oct. 28, 2025 Letter to D. Greenspan (attached hereto as Ex. 4). Leaf again declined to provide Plaintiffs with any additional information.

37.     Since then, Leaf has continued to feature on its social media accounts images and videos of infringing Trading Cards for sale, such as an unlicensed Trading Card featured in a December 22, 2025 video published on Leaf's Instagram page,[11] a screenshot of which is below.



38.     At present, Leaf continues to sell and promote each of the Trading Card sets described above (among others) on its official website and in retail stores.

**D.   <u>Leaf's Misconduct is Causing Irreparable Harm to Plaintiffs and Players and Sowing Marketplace Confusion</u>**

39.     Leaf's public disregard for the Group Player Rights is causing irreparable harm to Plaintiffs and Players. Leaf is also creating confusion in the Trading Card marketplace.

---

[11] Available at https://www.instagram.com/reels/DSkbWqKgFiF/.

40.    The Group Player Rights are extremely valuable to Plaintiffs and their Player-members. Through the GLA, Plaintiffs only permit groups of six or more Players' names, images, likenesses, personas, and other Attributes to be used on official, NFLPA-licensed products.

41.    Plaintiffs have the right to use and license the Group Player Rights, and Plaintiffs expend significant effort and resources protecting these Group Player Rights.

42.    Leaf has made clear that notwithstanding Plaintiffs' cease and desist correspondence, it intends to continue releasing new products and advertisements bearing the names, images, likenesses, and personas of Players in violation of the Group Player Rights. These items will not be submitted to Plaintiffs for approval, and Plaintiffs will have no way of ensuring that they meet their quality and content standards, nor will Plaintiffs be able to avoid association with Leaf and its Trading Cards even though Plaintiffs did not choose to do business with Leaf. Moreover, Leaf will continue to dilute the value of Plaintiffs' and its Player-members' group licensing program through the continued, unauthorized use of the Group Player Rights that Plaintiffs require their licensees to secure and pay for by signing a licensing agreement.

## COUNT I

### (False Endorsement Under the Lanham Act, 15 U.S.C. § 1125(a))

43.    Plaintiffs reallege and reincorporate by reference all preceding paragraphs as if set forth fully herein.

44.    Plaintiffs are the assignees of the Group Player Rights described herein and serve as the exclusive licensing agent of those rights. Plaintiffs also have the right to prosecute claims and suits in their own names to protect those rights.

45.    15 U.S.C. § 1125(a)(1) provides, in pertinent part, that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or

15

device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act."

46.     Leaf used Players' Attributes on its Trading Cards and related advertising and marketing in a false or misleading way that is likely to cause confusion, mistake, and/or deception regarding those Players' and/or Plaintiffs' association with, sponsorship of, or approval of the Trading Cards and/or connection with Leaf and its products.

47.     Leaf has used Players' Attributes on its Trading Cards in interstate commerce, including by distributing and selling its Trading Cards across state lines and advertising and selling its Trading Cards online in a manner accessible in multiple states.

48.     Leaf's use of Players' Attributes on its Trading Cards is material and likely to influence consumers' purchasing decisions. Consumers and NFL fans are more likely to purchase trading cards they believe are associated with, sponsored by, or approved by the Players featured and/or Plaintiffs. Thus, by associating its Trading Cards with these Players and with Plaintiffs via the unauthorized and unlicensed use of the Group Player Rights, Leaf increases the value and consumer appeal of its products.

49.     Leaf used Players' Attributes without authorization by Plaintiffs, with reckless disregard for the Group Player Rights.

50.     Leaf's use of the Group Player Rights in its Trading Cards violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

16

51.     Leaf's actions have caused harm to Plaintiffs in the form of lost sales of its authentic and officially licensed products; reputational harm; and harm to Plaintiffs' goodwill and the value of their licenses with third parties to manufacture and sell merchandise, not limited to trading cards, which are accurately promoted as "officially licensed" by Plaintiffs (both of which constitute injuries for which Plaintiffs have no adequate remedy at law). Leaf's unauthorized use of Group Player Rights is also harming Plaintiffs' ability to control the commercial use of the Group Player Rights. Moreover, Leaf has unjustly enriched itself by falsely promoting the nature of its relationship with the NFLPA and the Players featured in its Trading Cards without authorization or compensation.

52.     Leaf's conduct is willful and in bad faith, and therefore entitles Plaintiffs to recover their legal fees and treble damages under Section 1117(a) of the Lanham Act in this exceptional case.

53.     Leaf's intent to deceive customers through its knowingly unlawful continued use of the Group Player Rights, which will actually deceive customers and harm Plaintiffs' business opportunities in the Trading Card industry, justifies disgorgement of profits under the Lanham Act.

## COUNT II

**(Misappropriation of Rights of Publicity in Violation of Va. St. § 8.01-40 *et seq.*)**

54.     Plaintiffs reallege and reincorporate by reference all preceding paragraphs as if set forth fully herein.

55.     Plaintiffs are the assignees of the Group Player Rights described herein and serve as the exclusive licensing agent of those rights. Plaintiffs also have the right to prosecute claims and suits in their own name to protect those rights. The GLAs signed by nearly all Players grant Plaintiffs "the right to use [Player's] name, nickname, initials, autograph/signature (including

17

facsimiles), voice, picture, photograph, animation, image, likeness, persona, jersey number, statistics, data, copyrights, and/or biographical information . . . in group licensing programs." As such, Plaintiffs have standing to bring claims for misappropriation of Players' rights of publicity.

56.    Plaintiffs have the legal authority to license the right to use six or more Players' Attributes in any product.

57.    Leaf has continued to sell its products on its official website, including products bearing Player names, images, likenesses, personas, signatures, and other identifying Attributes. Leaf also continues to use Player names, images, likenesses, personas, signatures, and other identifying Attributes on its website and elsewhere to promote its unauthorized and unlicensed products. Leaf's continued use of Players' identities for commercial purposes without the express right to do so constitutes an infringement of Players' rights of publicity under applicable and governing state law. Va. St. § 8.01-40 *et seq*. Leaf's unauthorized use of Player names, images, likenesses, personas, signatures, and other identifying Attributes in connection with the sale and advertising of Trading Cards has occurred both within the State of Virginia and outside the State of Virginia.

58.    Virginia's statutory right to privacy, now codified as Va. St. § 8.01-40 *et seq.*, provides for a private right of action for damages and injunctive relief.

59.    Leaf's violations of applicable and governing state law for its unauthorized use of Players' Attributes for commercial purposes entitles Plaintiffs to recover equitable and monetary relief in an amount to be proven at trial to remediate such violations on behalf of Players who have assigned their Group Player Rights to Plaintiffs. Va. St. § 8.01-40 *et seq*.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief in the form of a judgment:

1.      Permanently enjoining Leaf from continuing to use Group Player Rights in its Trading Cards;

2.      Permanently enjoining Leaf from continuing to violate the Lanham Act by selling and promoting its Trading Cards using Group Player Rights;

3.      Permanently enjoining Leaf from misappropriating Players' rights of publicity which were assigned to Plaintiffs for their group licensing program;

4.      An award of compensatory damages for Leaf's unjust and unlawful profits arising from its misconduct;

5.      An award for disgorgement of Leaf's profits and all payments pursuant to Section 1117(a) of the Lanham Act;

6.      An award of compensatory and punitive damages in an amount to be determined at trial, including three times the actual damages, pursuant to Section 1117(a) of the Lanham Act;

7.      An award of reasonable attorneys' fees, costs, and disbursements;

8.      Pre- and post-judgment interest; and

9.      Any other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all issues triable by a jury.

Dated: May 1, 2026


/s/  *Amandeep S. Sidhu*
Amandeep S. Sidhu (VSB #71450)
WINSTON & STRAWN LLP
1901 L Street NW
Washington, DC 20036
(202) 282-5000
asidhu@winston.com

Jeffrey L. Kessler (*pro hac vice* forthcoming)
David Greenspan (*pro hac vice* forthcoming)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700
jkessler@winston.com
dgreenspan@winston.com

Diana Hughes Leiden (*pro hac vice* forthcoming)
WINSTON & STRAWN LLP
333 South Grand Ave, 38th Floor
Los Angeles, CA 90071
(213) 615-1700
dhleiden@winston.com

*Counsel for the*
*National Football League Players Association and*
*National Football League Players Incorporated*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2026, a true and accurate copy of the foregoing was filed electronically on CM/ECF and will be served on Defendant pursuant to Fed. R. Civ. P. 4.

/s/ *Amandeep S. Sidhu*
Amandeep S. Sidhu (VSB #71450)
WINSTON & STRAWN LLP
1901 L Street NW
Washington, DC 20036
(202) 282-5000
asidhu@winston.com

Jeffrey L. Kessler (*pro hac vice forthcoming*)
David Greenspan (*pro hac vice forthcoming*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700
jkessler@winston.com
dgreenspan@winston.com

Diana Hughes Leiden (*pro hac vice forthcoming*)
WINSTON & STRAWN LLP
333 South Grand Ave, 38th Floor
Los Angeles, CA 90071
(213) 615-1700
dhleiden@winston.com

*Counsel for the National Football League Players Association and National Football League Players Incorporated*